**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EMERSON ELECTRIC CO.,<br><br>Plaintiff,<br><br>v.<br><br>KATHERINE SI,<br><br>Serve: 4803 Marbrook Meadow Ln<br>Katy, Texas 77494<br><br>and<br><br>DRESSER, LLC d/b/a<br>DRESSER UTILTY SOLUTIONS<br><br>Serve: 16240 Port NW Dr #100<br>Houston, Texas 77041<br><br>and<br><br>BAKER HUGHES CO. d/b/a BAKER HUGHES<br><br>Serve: 575 N. Dairy Ashford Road, Suite 100<br>Houston, Texas 77079<br><br>Defendants. | ) | Case No. 4:25-cv-00161<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED VERIFIED COMPLAINT**

1. Plaintiff Emerson Electric Co. ("Emerson") brings this action against Defendants Katherine Si ("Si"), Dresser, LLC d/b/a Dresser Utility Solutions ("Dresser") and Baker Hughes Co. d/b/a Baker Hughes ("Baker Hughes") (collectively, "Defendants") to enforce non-competition and confidentiality agreements, to enjoin the threatened misappropriation of trade secrets, to enjoin tortious interference with existing and prospective business relationships, and to sue for breach of contract, unfair competition, unjust enrichment and conversion. Si is a former

Global Engineering Manager for Emerson's Automation Solutions business. Si recently resigned from her senior leadership position within Emerson to take a similar position at Dresser, a subsidiary of Baker Hughes. Dresser and Baker Hughes are Emerson's direct competitors. Si took her new position with Dresser despite Si, Dresser and Baker Hughes all being fully aware that Si had signed non-competition agreements with Emerson and accepted over $16,000 in incentive payments in exchange for doing so. *See* Ex. 1, Protective Covenants Agreement; *see also* Ex. 2, Restricted Stock Units Program Award Agreement.

2. Moreover, Si was privy to highly sensitive, confidential information regarding Emerson's global business.

3. Si should be enjoined from working for Dresser and Baker Hughes in violation of her post-employment obligations to Emerson, and she should be ordered to forfeit and return her incentive payments. Dresser and Baker Hughes, for their part, should be enjoined from unfairly competing with Emerson and from tortiously interfering with Emerson's contracts with Si.

## Parties

4. Emerson is a corporation organized, existing, and in good standing under the laws of the State of Missouri, with its principal place of business at 8027 Forsyth Blvd. St. Louis, Missouri 63105.

5. Si is an individual who, upon information and belief, is a citizen of Texas. Si currently resides in Texas.

6. Dresser, LLC is a Delaware limited liability company with its principal place of business located at 16240 Port NW Dr #100, Houston, Texas 77041. The sole member of Dresser, LLC is Baker Hughes Holdings LLC. Baker Hughes Holdings LLC is a Delaware limited liability company with its principal place of business in Texas. The members of Baker Hughes Holdings

LLC are (a) GE Oil & Gas US Holdings I, Inc.; (b) Baker Hughes Co.; and (c) EHHC NewCo LLC. GE Oil & Gas US Holdings I, Inc. is a Delaware corporation with a principal place of business in Ohio. EHHC NewCo LLC is a Delaware limited liability company with its principal place of business in Texas, and its sole member is Baker Hughes Co.

7. Baker Hughes Co. is a corporation that is organized, existing, and in good standing under the laws of Delaware, with its principal place of business located at 575 N. Dairy Ashford Road, Suite 100, Houston, Texas 77079.

## Nature of the Case

8. At the time she resigned, Si was employed by Emerson through its wholly owned subsidiary Emerson Automation Solutions Final Control US LP. For purposes of this Complaint, Emerson will refer to itself and Emerson Automation Solutions Final Control US LP collectively as "Emerson."

9. Si had become an employee of Pentair on or about July 2, 2010. Pentair was acquired by Emerson in 2017, and from that point forward, Si was an Emerson employee.

10. Si most recently held the position of NPD Engineering Manager PRV for Emerson Automation Solutions in Stafford, Texas.

11. Si resigned for the first time in December, 2024, but retracted that resignation after her supervisors spoke with her and reminded her of her non-compete obligations.

12. Si sent her second resignation to Emerson on January 7, 2025 (in a letter dated January 6, 2025) and stated her last working day would be January 10, 2025.

13. Si assured her colleagues at Emerson that she was taking time off for herself and was not going to work for a competitor. Relying on her assurances, Emerson allowed Si to keep her company phone and phone number.

14. Emerson's business includes manufacturing, process and software automation, supplying and servicing products, project management, and customer and business development across industrial markets and global locations.

15. In her role as NPD Engineering Manager PRV for Emerson, Si's responsibilities included: ensuring product designs comply with industry standards and customer requirements; overseeing new product development, certifications, and product line enhancements to maintain technical leadership; managing engineering data, supervising prototyping activities, and training engineers; providing technical support across departments and to customers and vendors as needed; reporting on project status and budget performance to leadership.

16. Si's duties with Emerson were: leadership, development, supporting design and development of existing and new products, technically improving existing products, supporting our global World Areas, some of our global plants, supporting growth plans, providing technical support and leadership with manufacturing, engineering, operations, developing talent, providing technical support globally, engineering documentation and reports, helping to resolve engineering issues that come up, as well as interfacing with global customers, partners, trade associations and governing bodies.

17. In Si's role with Emerson, she was exposed to business strategies and plans that apply worldwide, including new product development and research. As such, she held significant influence over Emerson's key clients, customers, employees, and industry trade organizations.

18. Si also had direct and intimate access to, and use of, confidential information belonging to Emerson. Without limitation, this information included customer information and lists, pricing information and pricing strategy, profit and loss information, technical and project

information, marketing and sales information, supplier information, and staffing information (including remuneration).

19. On January 16, 2025, Emerson learned that Si had joined Baker Hughes as an Engineering Manager at its facility in Pasadena, Texas. Baker Hughes is a direct competitor of Emerson, and Pasadena is roughly 20 miles from Si's former Emerson work location in Stafford, Texas.

20. Si is being employed by Dresser, a subsidiary of Baker Hughes.

21. Si's employment at Dresser and Baker Hughes puts Si in direct violation of the non-competition agreements she has entered into with Emerson.

**Emerson is a Direct Competitor with Dresser and Baker Hughes**

22. Emerson is a direct competitor to Dresser.

23. Emerson is a direct competitor to Baker Hughes.

24. On January 29, 2025, an in-house attorney for Dresser and Baker Hughes stated in an email that Si's "leader role is focused on After Market technical support for upgrades, maintenance and repair of installed products."

25. Emerson asked Dresser and Baker Hughes: "Which 'installed products' will Ms. Si work on for Baker Hughes? Please describe the products and their brand names."

26. On February 4, 2025, the same in-house attorney for Dresser and Baker Hughes stated in an email: "As for the request regarding a list of names of the installed products [Si] will work on, see below list of Baker Hughes installed products:

- Consolidated; Safety and relief valves
- Masoneilan; Used for applications where control valves are needed
- Mooney; Gas applications

- Becker. Gas transmission applications."

27. The Consolidated brand of safety and relief valves carried by Dresser and Baker Hughes ***directly*** competes with valves offered by Emerson's Pressure Relief Valve (PRV) strategic business unit. Emerson's PRV strategic business unit offers the Crosby and Anderson Greenwood brands of pressure relief valves.

28. The Masonelian, Mooney, and Becker brands carried by Dresser and Baker Hughes directly compete with valves offered by Emerson's Pressure Management business unit. Emerson's Pressure Management business unit includes Emerson's Pressure Relief Valve, Natural Gas and Industrial strategic business units.

29. At Emerson, Si was part of the Pressure Management business unit and thus worked on valves that directly compete with all of the brands identified by Dresser and Baker Hughes (Consolidated, Masonelian, Mooney, and Becker).

30. Emerson competes with Dresser and Baker Hughes globally, including in North America, Asia, the Middle East and Africa, and Europe.

**Si Signed Non-Compete Agreements with Emerson**

**A. The Protective Covenants Agreement**

31. Si's employment with Emerson was governed by a Protective Covenants Agreement dated May 30, 2019. Ex. 1.

32. In the Protective Covenants Agreement, Si acknowledged that Emerson "is a worldwide provider of pressure regulators, LP gas equipment, and relief valve technologies and solutions and that Employee will have significant contact with the Company's current and prospective Customers and Vendors in order to develop Company goodwill and customer relations so that Employee can promote the Company's interests and objectives." *Id.*

33. Si further acknowledged that Emerson would disclose to you "Confidential, proprietary, and Trade Secret Information about the Company's operations, systems, techniques, software, and processes, its Customers, Vendors, and other unique trade and business methods, all of which are valuable assets of the Company that are developed at great effort and expense to the Company; and that Employee may also generate such information as a part of Employee's job and may contribute to or develop inventions and innovative concepts that relate to the Business of the Company." *Id.*

34. The Protective Covenants Agreement contains obligations headed "Non-Competition", "Non-Solicitation of Customers", and "Non-Solicitation of Employees." *Id.*

35. The Non-Competition obligation prevents Si from being employed by a "Competing Business" for a period of twenty-four (24) months after her employment with Emerson ends. This obligation extends to the actual geographic area in which Si worked for Emerson and applies where Si would be providing "substantially similar services to a Competing Business as those which [you] provided to [Emerson]." *Id.* ¶ 3.

36. With respect to Dresser and Baker Hughes, the Protective Covenants Agreement makes clear that the defined term "Competing Business" includes "any individual (including Employee), corporation, limited liability company, partnership, joint venture, association, Customer, or other entity, regardless of form, that is engaged in whole or in relevant part in any business or enterprise which is the same as, or substantially the same as, the Business of the Company or that part of the business in which Employee worked in the last ten years of his or her employment with the Company." *Id.* ¶ 1(a).

37. Dresser and Baker Hughes are indisputably a Competing Business as defined by the Protective Covenants Agreement.

38. Si's obligations under the Protective Covenants Agreement also prevent her (a) from soliciting or accepting business from any customer or prospective customer of Emerson with which she had contact during her employment with Emerson, (b) from interfering with Emerson's relationships with any of its actual or potential vendors or suppliers, or (c) from hiring, soliciting or engaging in any other compensation related manner or capacity, any Emerson employee. These non-solicitation obligations continue for a period of twenty-four (24) months from the date of Si's termination. *Id.* ¶¶ 4, 5.

39. Si also undertook obligations to not use or disclose Emerson's confidential information.

40. In paragraph 10 of the Protective Covenants Agreement, Si acknowledged "that the Company is engaged in a highly competitive business, and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect the Company's legitimate business interests, including Company goodwill and customer relations, Confidential Information and Trade Secrets of the Company, the specialized skills and knowledge gained by Employee and the Company's other Employees during their employment, and the Company's Intellectual Property." *Id.* ¶ 10.

41. Paragraph 10 of the Protective Covenants Agreement further states that Si "acknowledges and agrees that a breach of any provision of this Agreement by Employee will cause serious and irreparable damage to the Company that will be difficult to quantify and for which a remedy at law for monetary damages alone may not be adequate. Accordingly, Employee agrees that if the Company should bring an action to enforce its rights under this Agreement and the Company establishes that Employee has breached or threatened to breach any of his obligations under this Agreement, the Company shall be entitled to injunctive relief." *Id.*

## B. The Award Agreement

42. Si chose to participate in Emerson's Restricted Stock Units Program.

43. On November 1, 2021, Emerson awarded Si 150 Restricted Stock Units ("RSUs"). Si signed her Restricted Stock Units Program Award Agreement ("Award Agreement") on November 30, 2021. *See* Ex. 2.

44. The 150 RSUs vested with Si on or about November 1, 2024, per the terms of the Award Agreement. *Id.*

45. On or about November 1, 2024, Si received 150 shares of Emerson common stock, less required tax withholdings. *See* Ex. 3.

46. The fair market value of the 150 shares of Emerson common stock that Si received on November 1, 2024, was $16,306.50 at that time. *Id.*

47. The Award Agreement sets forth the consideration given by Si to Emerson in exchange for being awarded the RSUs.

48. The Award Agreement provides: "In consideration of the foregoing and as a condition of this award, you agree to the following:

> 2. That during your employment by Emerson Electric Co. or any of its divisions, subsidiaries or affiliates (collectively, "Emerson"), and for a period of one (1) year immediately after your employment with Emerson ends for any reason, including by reason of divestiture or spinoff, you will not directly or indirectly, regardless of whether any payment has been made to you under the Program or the Plan, (a) compete against, or enter the employ of or assist any person, firm, corporation or other entity in a business that competes against any business of Emerson in which you were at any time employed, (b) compete against any such Emerson business by soliciting or pursuing its customers, or (c) solicit or hire any Emerson employees. Emerson shall be entitled to all rights and remedies available at law or equity for any breach or threatened breach of this Agreement, including a cancellation of this Award and any other outstanding equity award and/or the return of all shares (including any cash

> payment in lieu of shares) issued under this Program or or the Plan, damages, and injunctive relief.
>
> 3. This Award is conditioned upon your compliance with all practices and policies under Emerson's Ethics and Compliance Program, including our Code of Conduct and Code of Ethics, and that your actions will reflect Emerson's Core Value of Integrity. Any violation of our Ethics and Compliance Program may result in the forfeiture of this Award or the repayment of any amounts paid under this Award.
>
> 4. This Award and Agreement are governed by Missouri law, without regard to any conflicts of law principles thereof, and you consent to resolve any disputes exclusively in the courts in the Eastern District of Missouri.

Ex. 2.

49. The Award Agreement further states, in bold font: "You acknowledge and agree that you have read and understand the terms of this Agreement, the Plan and the Offering Circular for the Plan, and any supplements thereto, and accept this Award conditioned upon the terms set forth therein." *Id.*

50. Payments have been made by Emerson to Si pursuant to the Award Agreement she signed. Ex. 3.

51. Si received stock worth $16,306.50 from Emerson in 2024 under the Restricted Stock Units Program, less withholdings. *Id.*

52. The foregoing payments should be forfeited and returned to Emerson because Si has breached her post-employment obligations to Emerson, as described herein.

53. In order to protect its trade secrets and enforce its non-compete agreements with Si, Emerson is forced to bring this action to enjoin Si immediately, as well as for other damages and relief.

**Jurisdiction and Venue**

54. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse and the amount in controversy exceeds $75,000.

55. For diversity jurisdiction purposes, Emerson is a citizen of Missouri; Si is a citizen of Texas; Dresser is a citizen of Delaware and Texas; and Baker Hughes is a citizen of Delaware and Texas. Therefore, there is complete diversity of citizenship between the parties.

56. The amount in controversy is in excess of $75,000 in that (a) Defendants have caused or, if not enjoined, will cause Emerson to suffer lost profits in excess of $75,000, and (b) Si owes Emerson over $16,000 in incentive compensation that is now subject to disgorgement.

57. This Court also has pendant jurisdiction and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 in that all of Emerson's claims against Defendants are so related that they form part of the same case or controversy under Article III of the United States Constitution.

58. This Court has specific personal jurisdiction over Si pursuant to R.S.Mo. § 506.500.1(1) & (2) because Si entered into the Award Agreement with Emerson, a corporation with its principal place of business in Missouri; expressly agreed to jurisdiction in this Court in the Award Agreement; was employed by Emerson and/or its wholly owned indirect subsidiary; and thereby transacted business within Missouri.

59. This Court has specific personal jurisdiction over Dresser pursuant to R.S.Mo. § 506.500.1(3) because Dresser has committed a tortious act within Missouri, in that Dresser has tortiously interfered with Emerson's non-compete contract with Si (in the form of the Protective Covenants Agreement and Award Agreement). This tortious conduct was aimed at and caused harm in Missouri, thus satisfying both Missouri's long-arm statute and due process.

60. This Court has specific personal jurisdiction over Baker Hughes pursuant to R.S.Mo. § 506.500.1(3) because Baker Hughes has committed a tortious act within Missouri, in that Baker Hughes has tortiously interfered with Emerson's non-compete contract with Si (in the form of the Protective Covenants Agreement and Award Agreement). This tortious conduct was aimed at and caused harm in Missouri, thus satisfying both Missouri's long-arm statute and due process.

61. This Court has general personal jurisdiction over Baker Hughes because Baker Hughes maintains and operates a facility in this judicial district, located at 369 Marshall Avenue, Webster Groves, Missouri 63119.

62. Dresser and Baker Hughes are both aware of Si's non-compete obligations to Emerson, in the form of the Protective Covenants Agreement and Award Agreement, and are both aware that Si will violate those non-compete obligations if Si works for Dresser or Baker Hughes.

63. Dresser and Baker Hughes are both aware of Si's obligations to Emerson and its wholly owned subsidiary to preserve the confidentiality of sensitive business information, customer lists and other trade secrets.

64. Dresser and Baker Hughes are both aware that Si will inevitably disclose confidential and sensitive business information, customer lists and other trade secrets, if Si is allowed to work for Dresser or Baker Hughes.

65. Dresser's and Baker Hughes' extraterritorial acts produced or threaten to produce consequences in Missouri by virtue of the irreparable harm those acts will cause to Emerson in Missouri.

66. Dresser and Baker Hughes expressly aimed their conduct at Missouri by tortiously interfering with a Missouri contract (in the form of the Award Agreement) and by inducing Si to breach those contracts.

67. Dresser and Baker Hughes are both fully aware that if she is not enjoined, Si will breach her non-compete obligations to Emerson.

68. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) & (3) because the events giving rise to the claims in this action occurred in substantial part in this District (where Si transacted business by accepting the Award Agreement), because Si expressly consented to venue in this District in the Award Agreement, and because the harm and threatened harm has occurred and will continue to occur here if Defendants are not enjoined.

## COUNT I: BREACH OF CONTRACT
**(Against Si – Protective Covenants Agreement)**

69. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

70. A valid contract exists between Emerson and Si in the form of the Protective Covenants Agreement. Ex. 1.

71. The Protective Covenant Agreement is a contract that was, and is, supported by sufficient consideration as evidenced by Emerson's continued employment of Si.

72. Despite Emerson's performance and willingness to perform in compliance with the Protective Covenants Agreement, Si breached the contract and Dresser and Baker Hughes induced such breaches.

73. In the Protective Covenants Agreement, Si agreed that for a period of twenty-four (24) months following the termination of her employment with Emerson, she would "not, directly or indirectly, own, manage, operate, join, control, be employed by or with, or participate in any

manner with a Competing Business in the geographic territories where the Company does business at any time during Employee's employment, where doing so will require Employee to provide the same or substantially similar services to a Competing Business as those which he or she provided to Company while employed." Ex. 1, ¶ 3.

74. In the Protective Covenants Agreement, Si agreed that for a period of twenty-four (24) months following the termination of her employment with Emerson, she would "not, either on behalf of Employee or for any Competing Business, directly or indirectly solicit, divert, or appropriate, or attempt to solicit, divert or appropriate any Customer with whom Employee has had Material Business Contact in the five (5) year period preceding the termination of Employee's employment, for the purposes of providing products or services that are the same as or substantially similar to those provided in the Business of the Company and will not induce or encourage any Customer or Vendor to cease doing business with the Company or materially alter its business relationship with the Company. Id. ¶¶ 4, 5.

75. Si breached the Protective Covenants Agreement by, among other things (1) agreeing to employment in some capacity with a Competing Business, Dresser and Baker Hughes, and (2) diverting or attempting to divert Emerson's customers to Dresser and Baker Hughes.

76. While the full extent of Si's actions and the damages caused thereby are presently unknown, Si's breach of the Protective Covenants Agreement has caused and will continue to cause damages to Emerson, including without limitation jeopardy to and/or loss of Emerson's existing and future business relationships and contracts with its customers, lost profits, loss of goodwill, loss of customer contacts, unfair competition, loss of confidential business information, damage to or loss of Emerson's reputation, and loss of competitive advantage.

77. Accordingly, injunctive and other relief should be issued forthwith to enjoin Si's conduct, hold Si accountable for the promises and agreements she made, and award relief to Emerson to remedy Si's multiple breaches of the Protective Covenants Agreement.

**COUNT II: BREACH OF CONTRACT**
**(Against Si – Restricted Stock Units Award Agreement)**

78. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

79. A valid contract exists between Emerson and Si in the form of the Restricted Stock Units Program Award Agreement. Ex. 2.

80. The contract was, and is, supported by sufficient consideration as evidenced by Emerson's payments to Si. Ex. 3.

81. Despite Emerson's performance and willingness to perform in compliance with the Award Agreement, Si breached the contract and Dresser and Baker Hughes induced such breaches.

82. In the Award Agreement, Si agreed that for a period of one (1) year following the termination of her employment with Emerson or any of its divisions, subsidiaries or affiliates, she would not: "(a) compete against, or enter the employ of or assist any person, firm, corporation or other entity in a business that competes against any business of Emerson in which [Si was] at any time employed, (b) compete against any such Emerson business by soliciting or pursuing its customers; or (c) solicit or hire any Emerson employees." Ex 2, ¶ 2.

83. The payment to Si under the Award Agreement was "conditioned upon your compliance with all practices and policies under Emerson's Ethics and Compliance Program, including [Emerson's] Code of Conduct and Code of Ethics, and that your actions will reflect Emerson's Core Value of Integrity." Ex. 2, ¶ 3.

84. Si breached the Award Agreement by, among other things, (1) agreeing to employment in some capacity with a direct competitor, Dresser and Baker Hughes; (2) upon information and belief, sharing confidential and proprietary information with Dresser and Baker Hughes and/or using it on their behalf; and (3) diverting or attempting to divert Emerson's customers to Dresser and Baker Hughes.

85. While the full extent of Si's actions and the damages caused thereby are presently unknown, Si's breach of the Award Agreements has caused and will continue to cause damages to Emerson, including without limitation jeopardy to and/or loss of Emerson's existing and future business relationships and contracts with its customers, lost profits, loss of goodwill, loss of customer contacts, unfair competition, loss of confidential business information, damage to or loss of Emerson's reputation, and loss of competitive advantage.

86. Accordingly, injunctive and other relief should be issued forthwith to enjoin Si's conduct, hold Si accountable for the promises and agreements she made, and award relief to Emerson to remedy Si's multiple breaches of the Agreements.

## COUNT III: VIOLATION OF MISSOURI UNIFORM TRADE SECRETS ACT
**(Against all Defendants)**

87. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

88. The Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450 et seq. ("MUTSA") provides that an owner of a trade secret may bring a civil action to prevent any actual or threatened misappropriation of a trade secret.

89. Si signed the Award Agreement in which she agreed to comply with Emerson's Code of Conduct. Ex. 2, ¶ 3.

90. Emerson's Code of Conduct states, in pertinent part:

> Emerson employees, officers, and directors should maintain the confidentiality of all information entrusted to them by Emerson or its customers or business partners, except when disclosure is authorized or legally mandated. Confidential information includes all non-public information that might be of use to competitors, or harmful to the company or its customers, if disclosed. Emerson protects its intellectual property through patents, copyrights, trade secrets, and contractual confidentiality agreements. Employees cannot take or give away Emerson's intellectual property without authorization.

91. For the reasons set forth above, Defendants misappropriated and may continue to appropriate Emerson's trade secrets in violation of MUTSA.

92. Accordingly, Emerson brings this claim to prevent the actual or threatened misappropriation of its trade secrets by Defendants, as specifically provided under MUTSA.

93. Emerson takes reasonable steps to maintain the secrecy of its trade secrets, such as restricting access to information to only certain employees and requiring logins and passwords on its Information Technology systems.

94. Emerson requests a temporary restraining order, preliminary injunction, and permanent injunction under Mo. Rev. Stat. § 417.455 to prevent any actual or threatened misappropriation of its trade secrets.

95. Emerson also requests an award against Defendants to the maximum extent permitted under Mo. Rev. Stat. § 417.457.

**COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Dresser and Baker Hughes)**

96. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

97. Si has valid and enforceable post-employment obligations to Emerson, as memorialized in the Protective Covenants Agreement, Award Agreement and Code of Conduct.

98. Dresser and Baker Hughes have knowledge of Si's contractual obligations to Emerson, by virtue of their discussions with Si and by virtue of having been advised of the obligations by Emerson's counsel.

99. Despite their knowledge of Si's obligations to Emerson, Dresser and Baker Hughes have induced Si to violate those obligations and have aided Si in violating those obligations.

100. In doing so, the conduct of Dresser and Baker Hughes was wrongful and improper.

101. Dresser and Baker Hughes lack any privilege or justification for their interference with Emerson's contracts with Si.

102. Emerson faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

**COUNT V: UNFAIR COMPETITION**
**(Against All Defendants)**

103. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

104. Defendants' actions as specified above constitute unfair competition with Emerson by reason of Defendants' use and disclosure of Emerson's trade secrets and other confidential information.

105. As a direct and proximate result of Defendants' actions, Emerson has been damaged and will continue to be damaged.

106. Defendants' conduct was willful, intentional and outrageous, evidencing evil motive or reckless indifference to the rights of others.

**COUNT VI: UNJUST ENRICHMENT**
**(Against Si)**

107. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

108. Upon information and belief, Si does not intend to repay the Restricted Stock Units she received from Emerson.

109. The Award Agreement expressly states that if Si violates her post-employment non-compete and non-solicitation obligations, or any part of Emerson's Ethics and Compliance Program, the Restricted Stock Units awards are subject to cancellation, forfeiture and repayment. Ex. 2, ¶ 3.

110. Si owes Emerson a total of $16,306.50 under the Restricted Stock Units program, representing payments she received in 2024. Ex. 3.

111. By violating her contractual obligations to Emerson and by refusing to repay Emerson, Si has been unjustly enriched by retaining $16,306.50 that she is not entitled to retain.

112. As a result of Si's actions, Emerson has suffered and will continue to suffer harm, and Si will continue to benefit and gain, in the amount of $16,306.50.

**COUNT VII: CONVERSION**
**(Against Si)**

113. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

114. Upon information and belief, Si does not intend to repay the Restricted Stock Units payment she received from Emerson in the amount of $16,306.50.

115. By violating her contractual obligations to Emerson and by refusing to repay Emerson, Si has unlawfully exercised dominion and control over $16,306.50 that she is not entitled to retain.

116. As a result of Si's actions, Emerson has suffered damages.

**COUNT VIII: INJUNCTIVE RELIEF**
**(Against All Defendants)**

117. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

118. Si has breached, and continues to breach, her contractual agreements with Emerson, including without limitation by working for a direct competitor of Emerson and by threatening to use or actually using Emerson's trade secrets and other confidential and proprietary information for her employment at Dresser and Baker Hughes, all of which directly violates the Protective Covenants Agreement, the Award Agreement and the Code of Conduct.

119. Dresser and Baker Hughes have aided and assisted Si in breaching her contractual agreements, have induced her to breach her contractual agreements, have tortiously interfered with Emerson's agreements with Si, and have engaged in unfair competition against Emerson as described herein.

120. Dresser and Baker Hughes have threatened to violate or have actually violated the Missouri Uniform Trade Secrets Act, as described herein.

121. Emerson cannot fully and adequately determine the extent and effect of Defendants' actions at this time, which remain ongoing and unlawful.

122. Allowing Defendants to violate their contractual agreements, applicable law, or both, has resulted and will continue to result in irreparable harm to Emerson, including without limitation loss of customers, loss of goodwill, loss of customer contacts, unfair competition, loss

of confidential business information, loss of trade secrets, loss of reputation, loss of contracts with customers, and loss of competitive advantage.

123. Emerson will therefore suffer irreparable injury and harm from Defendants' violations should injunctive relief not issue in favor of Emerson and against Defendants.

124. At this time, it is impossible for Emerson to calculate the damage that has resulted, and will continue to result, from Defendants' violations. It is equally impossible to calculate the resulting damages to Emerson's loss of tangible or intangible property, loss of customers, loss of good will, loss of customer contacts, unfair competition, loss of confidential business information, loss of trade secrets, loss of reputation, loss of contracts with customers, and loss of competitive advantage.

125. Any harm that Defendants may allegedly incur as a result of the requested injunctive relief is overwhelmingly outweighed by the harm to Emerson should the relief not issue, a situation that Defendants unilaterally created by themselves.

126. Injunctive relief is not against the public interest; it would merely enforce Si's contractual obligations and Defendants' obligations under the law.

127. The requested injunctive relief, as detailed in Emerson's prayer for relief below, must be granted to avoid any immediate irreparable injury, loss, or damage to Emerson.

128. The requested injunctive relief serves to preserve the status quo pending a determination of the controversy between the parties.

129. Emerson has no adequate remedy at law concerning its claims set forth in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Emerson Electric Co. prays for judgment against Defendants Katherine Si, Dresser LLC and Baker Hughes Co. as follows:

(a) Monetary damages in an amount unknown at this time and to be proven at trial as a result of Defendants' breach of contract, tortious interference with contract, unfair competition, and violation(s) of the Missouri Uniform Trade Secrets Act;

(b) Monetary damages against Si for unjust enrichment and conversion relating to the Restrict Stock Units program payments she has received and wrongfully retained;

(c) Entering a temporary restraining order, preliminary injunction, and permanent injunction enjoining and restraining Defendants and their agents:

(i) During the period of two (2) years following the date of termination of Si's employment with Emerson, from acting, directly or indirectly (whether as an owner, employee, consultant, independent contractor or any other role) in any capacity with a company that directly competes with Emerson including Dresser or Baker Hughes; and

(ii) With respect to confidential and proprietary information (including trade secrets) of Emerson, from disclosing, using, or providing any such documents, information, or trade secrets, directly or indirectly, to anyone, except for the return of such documents, information, or trade secrets directly to Emerson or its attorneys;

(iii) During the period of two (2) years following the date of termination of Si's employment with Emerson, calling upon, soliciting, diverting, attempting to call upon, solicit, or divert (or assist in any of the foregoing), or accept business from/do

business with any customer/potential customer of Emerson that was a customer/potential customer during Si's employment with Emerson.

(d) Award Emerson its attorneys' fees, costs and expenses incurred or expended;

(e) Award pre- and post-judgment interest at the maximum rate permitted by law; and

(f) Such other and further relief as the Court deems just and proper.

Dated: February 12, 2025

Respectfully submitted,

DOWD BENNETT LLP

By: */s/ John D. Comerford*
James F. Bennett #46826MO
John D. Comerford #60164MO
7676 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
(314) 889-7300 (phone)
(314) 863-2111 (facsimile)
jbennett@dowdbennett.com
jcomerford@dowdbennett.com

*Attorneys for Plaintiff Emerson Electric Co.*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2025 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system.

The foregoing was also served via email on counsel for Defendants at the following email addresses:

victor.wright@bakerhughes.com

jmcoleman@seyfarth.com

*/s/ John D. Comerford*

**VERIFICATION**

I, Peter Mathew, declare:

1. I am Vice President, Pressure Relief Valves which is part of Emerson Automation Solutions Final Control US LP, a wholly owned subsidiary and business unit of Emerson Electric Co.

2. I verify that the foregoing First Amended Verified Complaint for and on behalf of Emerson Electric Co. was duly prepared under my direction with the assistance of counsel; that the facts stated therein have been assembled by authorized employees and counsel for Emerson; and that the allegations therein are true and correct to the best of my knowledge, information, and belief.

3. I declare under penalty of perjury that the foregoing is true and correct.

______________________________

Executed February 12, 2025.